Robert Weeks (#025821)
Jennifer Allen (#027941)
**ZWILLINGER WULKAN PLC**
2020 North Central Avenue, Suite 675
Phoenix, Arizona 85004
Tel: (602) 962-0089
Fax: (602) 962-0089
Email: robert.weeks@zwfirm.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| Clarissa Siebern, an individual, | No. CV25-00618-RCC |
|---|---|
| Plaintiff; | **FIRST AMENDED COMPLAINT** |
| v. | |
| Robert Berry III and Michelle Berry, a married couple; | **(JURY TRIAL DEMANDED)** |
| Defendants. | |

For her Complaint against Defendants, Plaintiff alleges as follows:

### PARTIES AND JURISDICTION

1.  Plaintiff Clarissa Siebern is an individual residing in Pima County, Arizona and at all relevant times was an employee of the University of Arizona and the Arizona Board of Regents.

2.  Defendant Dr. Robert Berry III ("Dean Berry") is an individual believed to be residing in Bloomington, Indiana. Michelle Berry is named for purposes of binding the marital community, as all of Dean Berry's acts were done in furtherance of the marital community.

3.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 .

4. The Court has personal jurisdiction over the Defendant because the actions giving rise to liability took place in Pima County while Dean Berry was working for the University of Arizona.

5. Venue is proper in this Court because all parties are residents of, or do business in, Pima County, Arizona, and all acts relevant to this complaint occurred within Pima County, Arizona.

### **THE FACTS**

6. Ms. Siebern was a Business Manager in the College of Education—Disability and Psychoeducational Studies ("DPS") Department at the University of Arizona. As such, she was a public employee of the State of Arizona.

7. As a Business Manager, Ms. Siebern's job responsibilities included processing certain financial transactions and other administrative tasks like room and course scheduling.

8. Ms. Siebern's direct supervisor was the department head, Dr. Carl Liaupsin.

9. During all times material to this Complaint, Dean Berry was the Dean of the College of Education, a public employee and was acting under the color of state law.

10. Ms. Siebern worked in the College of Education for many years. She had no history of prior discipline and there was no documentation of any performance problems.

11. Following several months of Ms. Siebern raising concerns about mismanagement of the college, she was terminated on October 4, 2023, with no warning or investigation.

12. After Dean Berry took over as Dean in 2022, Ms. Siebern and the college's other business managers became concerned with lack of compliance with mandatory policies and other financial mismanagement in the college.

**<u>Labor Law Violations</u>**

13. In May of 2023, Ms. Siebern met with Dean Berry privately to address some of her concerns, including a persistent problem with faculty not complying with proper hiring procedures and employment laws.

14. For instance, faculty would regularly have students and adjunct faculty start working at the college and only inform the business managers months later, at which point labor laws, such as e-verify, were already violated.

15. In addition, the delay in informing the business managers resulted in the workers being paid months after they started working, which violated state and federal employment laws regarding timely payment of wages.

16. Ms. Siebern raised additional concerns about mismanagement to Dean Berry during this meeting, including problems about unfair staff pay, staff workloads, and retention issues that she believed were creating a critical risk to the entire college, not just her department.

17. Ms. Siebern's May 2023 meeting with Dean Berry was not part of Ms. Siebern's ordinary job responsibilities. While Ms. Siebern learned of these violations of law after being asked to process the relevant transactions, it was not part of Ms. Siebern's role to monitor the faculty's compliance and report their violations to the Dean.

18. It was also not Ms. Siebern's duty to critique mismanagement by the college leadership that was resulting in unfair pay and unreasonable workloads.

19. Ms. Siebern raised her concerns about the faculty's labor law violations outside her chain of command, including to Assistant Dean Puig, Director of Finance Marguerite Sallet, and Eryn McKinley on the Grant Management Team in multiple conversations in 2023. Ms. Siebern sent an email about these labor law violations to Associate Dean Diel-Amen on October 3, 2023. Ms. Siebern

also raised this concern in a meeting with the human resources department on October 4, 2024.

### Financial Mismanagement

20. In June of 2023, Ms. Siebern and the college's other business managers met with Dean Berry to raise concerns about the college's financial mismanagement, including that the Assistant Dean of Finance, Mary Puig, and the Director of Finance, Marguerite Sallet, were not properly trained or competent at their roles.

21. Ms. Siebern and the other business managers were concerned that Puig and Sallet did not understand how to properly administer the college's grant funding, and that their incompetence was putting the college at risk of a financial catastrophe if grant funding was revoked or had to be repaid.

22. Ms. Siebern's June 2023 meeting with the Dean was not pursuant to her job responsibilities. Managing grant funding was the responsibility of a separate grant management team.

23. Puig and Sallet were considered superior in rank to Ms. Siebern, and it was not Ms. Siebern's role to evaluate their performance and report her opinions to the Dean.

24. Ms. Siebern spoke outside her chain of command about her concerns regarding Puig and Sallet's incompetence, including with the business managers of the other departments and to Associate Dean Diel-Amen.

### Incumbent Reviews

25. Morale among the college staff was very low.

26. The college was in a substantial budget deficit, and Dean Berry was trying to save money by keeping the college short-staffed and forcing single staff members to perform multiple roles.

27. When staff members left the college, instead of replacing them, Dean Berry would force existing staff members to take over their duties.

28. While Dean Berry was forcing staff members to perform multiple jobs, he was not adjusting their pay to match their additional responsibilities as university policy required.

29. The university sets minimum pay requirements for certain roles, and the Dean did not have discretion to pay employees less than what the university required for their positions.

30. The staff had requested and were entitled to an "incumbent review," which meant an independent board at the university would review their job responsibilities and increase their pay if required.

31. However, despite the staff having a right to an incumbent review under university policy, Dean Berry was not allowing the incumbent reviews to move forward.

32. Thus, Dean Berry was trying to address the budget deficit by keeping the staff's pay artificially low in violation of university policy.

33. Accordingly, the college staff were unhappy, underpaid, and overwhelmed with the volume of work.

34. At the same time, faculty, staff and students in the college were becoming increasingly frustrated because the staff could not handle their requests fast enough.

35. Staff members started leaving the college because they could get the same job elsewhere in the university (or just elsewhere) for more pay and less stress.

36. The resignations made the understaffing problem worse and it was threatening the college's ability to properly function.

37. After prompting from Ms. Siebern, Dean Berry temporarily pacified the staff by promising to do incumbent reviews for the staff.

38. However, in August of 2023, a staff member quit after the HR manager, Patricia Morales, told him that the college would not be doing the incumbent reviews they had previously promised.

39. On August 28, 2023, Ms. Siebern sent an email to a large group of the college leadership criticizing Dean Berry's decision to backtrack on his promise to do incumbent reviews for the staff. A copy of the email is attached hereto as **Exhibit A**.

40. Ms. Siebern noted in her email that this decision was likely going to cause additional resignations because the staff felt they were not being paid for the level of work they were required to do. Ms. Siebern herself never threatened to resign.

41. Ms. Siebern's email also warned, "Our department and college cannot sustain these resignations" and pleaded with the college leadership to "consider the needs of the department."

42. The concerns that Ms. Siebern raised were not part of her official job responsibilities. It was not part of Ms. Siebern's job responsibilities to criticize Dean Berry's management of the college or monitor his compliance with mandatory university policies.

43. Conducting incumbent reviews was also not part of Ms. Siebern's job responsibilities. Incumbent reviews were conducted by the human resources department in combination with the university's compensation team. Ms. Siebern's role in the incumbent review process was limited to compiling documentation about the employee's current role and submitting it to human resources.

44. Ms. Siebern's August 28, 2023 email was directed mostly to individuals outside her chain of command.

45. Ms. Siebern's chain of command included her direct supervisor, Dr. Liaupsin, who reported to Dean Berry.

46. Iliana Reyes was the Associate Dean of Academic Affairs and was not part of Ms. Siebern's chain of command. While Associate Dean Reyes had a leadership position in the college, the scope of her authority focused on students and did not include Ms. Siebern's role in DPS.

47. Regina Diel-Amen was the Associate Dean of Faculty Affairs and was not part of Ms. Siebern's chain of command. While Associate Dean Diel-Amen had a leadership position in the college, the scope of her authority focused on faculty and did not include Ms. Siebern's role in DPS.

48. Ms. Puig was the Assistant Dean of Finance and was not part of Ms. Siebern's chain of command. Ms. Puig and Ms. Siebern had different areas of responsibility, and Ms. Puig had direct reports that did not include Ms. Siebern or Dr. Liaupsin.

49. Yvonne Gonzalez-Lewis was the human resources director and was not part of Ms. Siebern's chain of command. Human resources was a separate and distinct department from DPS.

50. Ms. Siebern included these individuals in her email because she believed them to be persons of influence in the college who could be most helpful in affecting a change on this issue.

51. Following Ms. Siebern's speaking out about the mismanagement of her superiors, Dean Berry and Ms. Morales agreed to go through with the incumbent reviews they had previously promised.

52. Dean Berry discussed with other individuals in the college that he did not believe the staff were really entitled to the raises for which Ms. Siebern was advocating.

53. On September 25, 2023, Ms. Siebern contacted Associate Dean Diel-Amen and asked for her advice about taking her concerns about the college's mismanagement outside the college.

54. On or around September 26, 2023, Dean Berry learned the result of the incumbent review process, which indicated that Ms. Siebern had been correct and that the department staff were entitled to significant raises under university policy.

55. Ms. Siebern had a meeting with her supervisor, Dr. Liaupsin, as well as Ms. Morales and Assistant Dean Puig in which Ms. Siebern was instructed not to discuss the incumbent review results with anyone.

56. Despite this instruction, Ms. Siebern shared the incumbent review results with her staff, the business managers of other departments, and Associate Dean Diel-Amen.

57. A few days later, Ms. Siebern requested a meeting with her human resources representative to discuss her concerns about mismanagement in the college. Her email specifically mentioned concerns about whistleblowing. This meeting took place on October 4, 2023, and Ms. Siebern reported to human resources that she had been engaging in whistleblowing about the incumbent reviews, violations of employment laws, and financial mismanagement for the past several months.

### Ms. Siebern's Termination

58. On September 28, 2023, Dean Berry contacted Ms. Morales in human resources to recommend discipline against Ms. Siebern due to a delay in processing a payment to Student A.

59. Dean Berry was aware of the delayed payment to Student A in early August but did not recommend any discipline against Ms. Siebern at that time.

60. Processing the payment to Student A was not within Ms. Siebern's job responsibilities, but she had been assisting with it due to the college being short-staffed.

61. Ms. Morales consulted with Diane Brennan, the Assistant Vice President of Human Resources, and informed Dean Berry that they were concerned about issuing any formal discipline to Ms. Siebern because Ms. Siebern had no prior documentation of former discipline. However, Ms. Morales and Ms. Brennan were willing to approve issuing a written warning to Ms. Siebern.

62. Dean Berry was not satisfied with only a written warning, so he met with the university's office of general counsel to get permission to terminate Ms. Siebern.

63. Following the meeting with the office of general counsel, Dean Berry obtained approval to terminate Ms. Siebern by accusing her of violating the Fair Labor Standards Act. However, this allegation was false. Student A had been working on a volunteer basis and was promised payment after the work was completed. Therefore, Student A was not an employee and was not covered by the Fair Labor Standards Act.

64. Ms. Siebern's supervisor, Dr. Liaupsin, did not believe terminating Ms. Siebern was justified.

65. In order to bolster the case for Ms. Siebern's termination, Dean Berry also falsely accused Ms. Siebern of failing to pay a second student.

66. The Defendant notified Plaintiff on October 4, 2023, that her employment was terminated.

67. Multiple facts indicate that the delayed payment to Student A was used as pretext for terminating Ms. Siebern.

68. Although university policy requires a thorough and fair investigation before formal discipline, no thorough and fair investigation was done prior to

9

terminating Ms. Siebern. Dean Berry never gave Ms. Siebern an opportunity to present her version of events, nor did Dean Berry obtain information from any of the other individuals involved in processing the payment to Student A.

69. University policy also requires that, if possible, employees should be given a warning and opportunity to improve before formal discipline is imposed, and termination should only be the first form of discipline in extreme cases.

70. Dean Berry also offered shifting explanations for Ms. Siebern's termination. He originally alleged that he was terminating Ms. Siebern for falsifying documents before changing the basis of the decision to an allegation that Ms. Siebern violated the Fair Labor Standards Act.

71. After Ms. Siebern's termination, Dean Berry claimed that he only decided to terminate Ms. Siebern because he learned that Ms. Siebern had allegedly failed to pay a second student. Dean Berry later admitted that he decided to terminate Ms. Siebern before learning about this second student.

72. Dean Berry was also aware of repeated problems in the college with delayed payments and failure to follow employment laws, and no one else except Ms. Siebern was ever disciplined for these issues.

73. Over the course of several months before Plaintiff's termination, she had repeatedly reported to her supervisors and the leadership of the college that the college was violating employment laws, including failure to comply with e-verify (A.R.S. § 23-214) and failure to timely pay wages (A.R.S. § 23-351).

74. Plaintiff raised her concerns regarding mismanagement and labor law violations to persons in managerial and supervisory positions, including Dean Berry, Dean of Finance Mary Puig, Director of Finance Marguerite Sallet, and Department Head Dr. Carl Liaupsin.

75. Plaintiff's termination was in retaliation for her exercise of her rights under the First Amendment.

76. Dean Berry's conduct showed evil intent and callous indifference to Ms. Siebern's federally protected rights.

**Media Coverage**

77. At the time of Ms. Siebern's termination, the university's budget crisis was not common knowledge.

78. However, shortly after her termination, it became public knowledge and was the subject of frequent reporting as it unfolded over the following months.

79. Media coverage of the university's budget crisis included concern about how the budget crisis would affect staff pay, workloads, morale, and retention.

80. On November 15, 2023, the AZ Luminaria reported concerns from Gary Rhoades, a professor in the College of Education, that the "university's administration is making staff, faculty and students pay for their financial missteps." Exhibit B.

81. On December 22, 2023, the Arizona Daily Star reported on concerns that the university's budget crises would lead to "deferment of salary increases" for university staff, force them to take on "increased workloads," and that "workers in our university will once again take the brunt of senior leadership's mismanagement." Exhibit C.

82. On January 16, 2024, the Arizona Daily Star reported on concerns that a "hiring and compensation freeze" to address the budget crisis would "significantly impact recruitment and retention of faculty and staff" and "add to the work burden and stress on directors, staff and faculty." Exhibit D.

83. On April 3, 2024, the Arizona Daily Star reported on concerns of "massive cuts and a 'brain-drain' of faculty and staff," "a kick in the gut to morale" of faculty and staff, and the fact that faculty and staff are "seriously overburdened as more of their colleagues leave and are not replaced." Exhibit E.

## COUNT ONE
### First Amendment Retaliation 42 U.S.C. § 1983

84. Plaintiff incorporates the allegations contained in the preceding paragraphs.

85. Plaintiff engaged in activity protected by the First Amendment by reporting mismanagement, violations of law, and other issues of public concern.

86. The concerns Ms. Siebern raised were not part of her official job responsibilities.

87. Plaintiff's termination was an adverse employment action.

88. Plaintiff's exercise of her first amendment rights was a motivating factor in the decision to terminate her.

89. Plaintiff has suffered damages.

## DEMAND FOR JURY TRIAL

90. Plaintiff demands a trial by jury on all counts alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for damages and judgment against the Defendant as follows:

a) Awarding Plaintiff lost wages, benefits, and other compensatory damages in an amount to be proven at trial;

b) Emotional distress damages;

c) Punitive damages;

d) Pre-judgment and post judgment interest;

e) Costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and as otherwise authorized by law; and

f) Such other and further relief which may seem just and reasonable under the circumstances.

RESPECTFULLY SUBMITTED this 15th day of January, 2026.

**ZWILLINGER WULKAN PLC**

By:    /s/ Robert Weeks
Robert Weeks
*Attorney for Plaintiff*

13

**CERTIFICATE OF SERVICE**

I hereby certify that on January 15, 2026, I caused the foregoing document to be filed electronically with the Clerk of Court for the U.S. District Court for the District of Arizona by using the CM/ECF System.   Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Ann Hobart
Jordan Kendall
Assistant Attorneys General
Kristin K. Mayes
Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004
Ann.hobart@azag.gov
Jordan.kendall@azag.gov
*Attorneys for Defendants*

By:   */s/ Tina M. Ziegler, ACP*